UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JAIME S. LOUIS, <br><br> Plaintiff, <br><br> v. <br><br> THE HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY, <br><br> Defendant. | CASE NO. C19-56 MJP <br><br> FINDINGS OF FACT AND CONCLUSIONS OF LAW |

This matter came on for bench trial on December 20, 2019, before the Court sitting without a jury. Plaintiff was represented by Jay C. Kinney of Kinney Law Group. Defendant The Hartford Life and Accident Insurance Company was represented by Sarah Swale of Jensen Morse Baker, PLLC. Jurisdiction is vested in this Court by virtue of 29 U.S.C. § 1132(e).

On August 19, 2019, Defendant Hartford submitted the Administrative Record to the Court (Dkt. 15, Exhibit 1), as well as the applicable Plan documents (Dkt. 15, Exhibit 2). The parties agree that the Administrative Record and Plan documents comprise the documentary evidence in this case.

The Court considered the evidence presented, the exhibits admitted into evidence, and the arguments of counsel. The Court has weighed the exhibits, evidence, and argument *de novo* using the required "preponderance of the evidence" standard. Plaintiff advised the Court at the commencement of the hearing that he was abandoning any claims of disability based on his dermatological issues and would rely solely on proof of his disability based on his impaired gastrointestinal conditions. Now the Court, being fully advised in the premises, makes its Findings of Fact and Conclusions of Law as follows:

## FINDINGS OF FACT

**A.     The Plan Issued to Oracle America, Inc.**

    1.     The Hartford issued a Group Insurance Policy to Oracle America, Inc. ("Oracle"), the former employer of Plaintiff Jaime S. Louis ("Plaintiff"). Oracle, as the Policyholder, established the Group Long Term Disability Plan for Employees of Oracle America, Inc. (the "Plan"). PLAN 000001-53.

    2.     The Plan pays Long-Term Disability ("LTD") benefits to otherwise eligible participants who become "Disabled" under the terms of the Plan. PLAN 000007-8.

    3.     The Plan defines disability – in this case "Total Disability" – as follows:

> **Total Disability or Totally Disabled**: means during the Elimination Period and for the next 24 month(s), as a result of injury or sickness, You are unable to perform with reasonable continuity the Essential Duties necessary to pursue Your occupation in the usual or customary way.

PLAN 000025.

    4.     The Elimination Period referenced in the definition of Total Disability provides:

> **The Elimination Period** is the period of time You must be Disabled before benefits become payable. It is the last to be satisfied of the following:
>
>     1.     the first 90 consecutive day(s) of any one period of Disability; or

2. with the exception of benefits required by state law, the expiration of any Employer sponsored short term disability benefits or salary continuation program.

PLAN 000008.

5. The Benefits Section of the Plan further provides:

**When do benefits become payable?**

You will be paid a monthly benefit if:

1. You become Disabled while insured under this plan;

2. You are Disabled throughout the Elimination Period;

3. You remain Disabled beyond the Elimination Period;

1. You are, and have been during the Elimination Period, under the Regular Care of a Physician; and

4. You submit proof of loss.

PLAN 000010 [*sic*].

6. Where a claimant is terminated from his employment for any reason, coverage terminates on the termination date unless the employee can prove that he was totally disabled on the date of the termination and remained continuously and totally disabled for the next 90 days. PLAN 000017-18.

7. By virtue of his employment with Oracle, Plaintiff was an eligible participant in the Plan at all times relevant hereto, and his claim for benefits is governed by the terms and definitions contained in the Plan.

8. To qualify for benefits under the terms of the Plan, Plaintiff had to prove that his medical condition or diagnosis rendered him unable to perform his job "with reasonable continuity" on the date of his termination and for the "the first 90 consecutive days" and "throughout the Elimination Period." PLAN 0008, 10, 17-18, 25.

9. This interpretation of the plain language of the Plan must be read in conjunction with the limited exception in the Plan for a claimant who returns to work during the Elimination Period:

> **What happens if You return to work but become Disabled again?**
>
> Attempts to return to work as an Active Full-Time or Part-Time Employee during the Elimination Period will not interrupt the Elimination Period, provided no more than 30 such return-days are taken.
>
> Any day You were Actively at Work will not count towards the Elimination Period.

PLAN 000011. This limited exception only makes sense if "Totally Disabled" is read to mean "unable to work as a result of injury or sickness for 90 days within a 120-day period."

10. Further, since Plaintiff's employment was terminated by Oracle on October 13, 2017, he could not restart the 90-day Elimination Period on a later date (as he could not actively return to work after that date). *Id.*; HARTLOU 000074, 85-86.

**B. Plaintiff Misses Work Intermittently; Oracle Terminates Plaintiff's Employment on October 13, 2017, Which Triggers the 90-day Elimination Period.**

1. Plaintiff worked at Oracle as a Senior Principal Product Strategist, a sedentary position. HARTLOU 000085-87.

2. Starting in May 2017, Plaintiff began missing work intermittently, but not with enough frequency to satisfy the 90-day Elimination Period under the Recurrent Disability definition in the Plan for any 90-day period during the final five months of his employment with Oracle. *Id.*; PLAN 000011.

3. Oracle terminated Plaintiff's employment, effective October 13, 2017. HARTLOU 000074, 85-86. The reasons for Plaintiff's termination are not stated in the record provided to the Court. The parties agree that the 90-day Elimination Period for Plaintiff's claim therefore began on October 13, 2017, and ran through January 10, 2018. *Id*.

**C. Plaintiff's Pre-Termination Medical Records.**

1. For the period between May 24, 2017 (the first day he missed work) and October 13, 2017 (the date of his termination), Plaintiff provided records of three visits with

gastroenterologists and no visits with any dermatologists. HARTLOU 000919-928, 936-941.

2. Plaintiff's first visit was on June 15, 2017, with Dr. Nizar A. Mukhtar, Gastroenterology, who noted a history of ulcerative colitis and a likely diagnosis of primary sclerosing cholangitis ("PSC"), a disease of the bile ducts. Dr. Mukhtar also noted that Plaintiff had been asymptomatic for two years but recently had elevated liver tests and several weeks of diarrhea. The diarrhea had subsided over the past two days without intervention. Dr. Mukhtar referred Plaintiff to Dr. Christopher Carlson, Gastroenterology, for further GI workup. HARTLOU 000936-941.

3. Dr. Mukhtar also noted prior diagnoses of hidradenitis suppurativa ("HS") and pruritis (itchy skin) by Dr. Renata Jenkin, Dermatology. However, Plaintiff's physical exam was normal, and Dr. Mukhtar did not note any current symptoms related to those diagnoses. As for Plaintiff's skin exam, Dr. Mukhtar noted "No cutaneous stigmata of chronic liver disease, no rashes," and further indicated Plaintiff was "in no apparent distress." *Id.*

4. Plaintiff's second visit was on June 22, 2017, with Dr. Carlson, who noted that Plaintiff was doing well and had developed diarrhea for two weeks following a trip to Jamaica the month before. Dr. Carlson also noted that the diarrhea had stopped over a week ago, and Plaintiff's bowel movements had returned to normal. HARTLOU 000924-928.

5. Dr. Carlson likewise noted the prior diagnoses of HS and pruritis, which waxed and waned in intensity. Dr. Carlson conducted a physical exam of Plaintiff, including his skin, and noted that Plaintiff was "in no acute distress" and had "no cysts or drainage at this time." *Id.*

6. Plaintiff's third visit was on September 14, 2017, when he returned to Dr. Carlson, this time with a primary concern of urinary frequency. Plaintiff reported that his pruritis was a little better. His physical exam was otherwise normal and he was again noted to be "in no acute distress." HARTLOU 000919-923.

7. During the claims review process, Dr. Carlson admitted that he did not specifically keep Plaintiff out of work after this third visit. HARTLOU 000910-911.

8. Plaintiff did not visit any of his treating physicians again between September 14,

2017 and his termination from Oracle on October 13, 2017.

9. There is no evidence of any of change in Plaintiff's condition on October 13, 2017.

**C. Plaintiff's Medical Records During the 90-Day Elimination Period.**

1. Plaintiff did not visit any of his treating physicians for the first 55 days of the 90-day Elimination Period from October 13, 2017 to December 6, 2017.

2. During the last 35 days of the Elimination Period, from December 7, 2017 to January 10, 2018, Plaintiff made two visits to his treating physicians.

3. Plaintiff's first visit was on December 7, 2017, with his treating dermatologist, Dr. Renata Jenkin. Dr. Jenkin noted that Plaintiff was "in no acute distress" and that Plaintiff reported his condition as "currently clear" and "mild in severity." Dr. Jenkin performed a dermatological physical exam and noted acne on his arms, legs, and trunk, along with dry skin. Dr. Jenkin recommended a topical acne wash for the shower, and daily moisturizer. Dr. Jenkin also confirmed that Plaintiff's HS was "clear today." Dr. Jenkin recommended a follow-up in six months. HARTLOU 000882-883.

4. Plaintiff did not see Dr. Jenkin again until April 9, 2018, almost three months after the 90-day Elimination Period ended. HARTLOU 000880-881.

5. Plaintiff's second visit during the 90-day Elimination Period was on December 21, 2017, with his treating gastroenterologist, Dr. Carlson, for a follow-up on his ulcerative colitis and PSC. Dr. Carlson noted that Plaintiff was applying for disability, that he brought in his disability paperwork, and that Plaintiff felt he could not work due to loose stools. Dr. Carlson conducted a physical exam and noted that Plaintiff was "in no acute distress." HARTLOU 000914-918.

**D. Plaintiff Applies for LTD Benefits, Which are Denied by The Hartford.**

1. Plaintiff applied for LTD benefits under the Plan. As part of the administrative claims process, The Hartford obtained a Peer Review Report from Jeffrey B. Danzig, Board

Certified in Internal Medicine, through an independent, third-party vendor. HARTLOU 000897-899.

2. As Plaintiff had not yet advised The Hartford that he considered his dermatological issues to be disabling, The Hartford did not yet have any dermatological records, and Dr. Danzig reviewed the records from treating gastroenterologists Dr. Mukhtar and Dr. Carlson. Dr. Danzig concluded:

> Based on medical opinion, examination of the records, and clinical rationale, the claimant does not have any restrictions and limitations from 10/13/17 to present and beyond.
>
> From a GI perspective, there are no supported restrictions or limitations. However, the claimant should have restroom access at all times.

HARTLOU 000897-899.

3. The Hartford sent Dr. Danzig's report to Dr. Carlson for comment; Dr. Carlson failed to respond. HARTLOU 000129-130.

4. Based on Dr. Danzig's Report, and the lack of medical records showing continuous and total disability throughout the Elimination Period, The Hartford denied Plaintiff's LTD benefits claim on May 24, 2018, with the understanding that The Hartford would re-review the claim after receiving records from the other treating providers recently revealed by Plaintiff related to his dermatological issues. HARTLOU 000120-124.

E.  **Plaintiff Revokes The Hartford's Authorization to Contact His Providers.**

1. On June 13, 2018, in the midst of The Hartford's efforts to request records from the newly-identified treating physicians, Plaintiff sent an email stating, "… I would like to rescind my authorization for The Hartford to directly contact my physicians. Moving forward I will take gather [sic] the necessary documentation from my physicians and forward the requested information to you for review." HARTLOU 000674.

2. In response, The Hartford updated its claim files to reflect the rescinded

authorization. HARTLOU 000673.

**F.    The Hartford Receives Additional Records from Plaintiff, All of Which are After the Elimination Period.**

1.    During the ensuing claims review process, Plaintiff provided additional records from his providers, none of which reflected examinations during the Elimination Period.

2.    The first record Plaintiff provided was from a visit with Dr. Brenda Newman, Dermatology, on February 21, 2018, more than a month after the 90-day Elimination Period ended. Plaintiff had a chief complaint of mild acne on his left cheek. Dr. Newman also noted that Plaintiff had an itchy rash on his chest, and one skin lesion on his left armpit, but no groin lesions or any painful cysts or drainage. Plaintiff was "in no acute distress." Dr. Newman provided an injection for the armpit lesion and recommended light therapy for the itching. HARTLOU 000746-747.

3.    On March 7, 2018, Plaintiff visited Dr. Newman again. One of the acne cysts on his cheek and the lesion in his left armpit were worse, and he had a new one on his nose. He still had an itchy chest. Dr. Newman provided injections again. HARTLOU 000744-745.

4.    Plaintiff visited Dr. Newman for more injections on March 30 and April 4, 2018. Again, there were no indications in these visits that Plaintiff had any groin lesions or any painful cysts or drainage that might cause any work restrictions. HARTLOU 000741-747.

5.    On April 9, 2018, Plaintiff visited Dr. Jenkin, who noted a flare-up of lesions in the last 3-4 days in the groin and left buttock. This is the first note of any groin lesions, and it occurs more than three months after the 90-day Elimination Period ended. Further, these groin lesions did not appear to be painful or debilitating. Dr. Jenkin noted that Plaintiff was "in no acute distress" and conducted a MIPS pain assessment, concluding: "Pain assessment using a standardized tool is documented as negative, no follow-up plan required." HARTLOU 000880-881.

6.    On April 25, 2018, Dr. Jenkin noted a new cyst on the perineum that had been

there for one week. Again, a pain assessment was negative, and Plaintiff was "in no acute distress." HARTLOU 000878-879.

7. On May 7, 2018, Plaintiff's primary care physician, Dr. Sai Prasanna Mannem, Internal Medicine, completed an Attending Physician Statement ("APS"). Dr. Mannem provided primary diagnoses of ulcerative colitis and Type 2 diabetes, with a secondary diagnosis of PSC, and no mention of any dermatological issues. For restrictions and limitations, Dr. Mannem wrote simply, "no return to work," with no explanation. Dr. Mannem provided an expected return to work date of May 25, 2018. Dr. Mannem did not provide any medical records of office visits or test results to support her after-the-fact opinions about Plaintiff's conditions. HARTLOU 000902-903.

8. On June 22, 2018, Dr. Mannem provided an updated APS with a different primary diagnosis of HS and a secondary condition of PSC, and with no explanation for this substantive change to her APS. Dr. Mannem again opined that Plaintiff could do "no work at all." HARTLOU 000708-709.

9. Dr. Mannem's two APS reports are internally inconsistent and are not supported by any medical records or tests.

10. On May 18, 2018, Plaintiff visited Dr. Newman and reported painful cysts on his pubic bone. Dr. Newman noted that Plaintiff's HS was "worsening," with a total of four lesions on various parts of his body, and provided injections. This visit was over four months after the end of the 90-day Elimination Period. HARTLOU 000739-740.

11. On May 25, 2018, Dr. Jenkin completed an APS identifying Plaintiff's primary condition as HS. In support of the identified work restrictions, Dr. Jenkin explained that Plaintiff had "debilitating golf ball size inflammatory cysts in groin area including scrotum and gluteal fold." HARTLOU 000884-885.

12. Dr. Jenkin's APS is a departure from her observations made in December of 2017, during the Elimination Period, when she noted that Plaintiff was "clear" and "mild" and made no mention of any cysts in Plaintiff's groin area. HARTLOU 000882-883.

13. Dr. Jenkin's support of Plaintiff's leave from work for his conditions does not, therefore, persuasively apply to the 90-day Elimination Period. HARTLOU 000884-885.

14. On June 25, 2018, Dr. Newman completed an APS identifying Plaintiff's primary condition as HS with secondary condition of prurigo nodularis. Dr. Newman opined that, "while flaring," Plaintiff's condition interfered with his ability to sit and stand during an 8-hour work day. HARTLOU 000507-508.

15. Dr. Newman provided no evidence of any "flare-ups" in Plaintiff's groin area during the 90-day Elimination Period that required any drainage or injections or caused any difficulty with sitting or standing, much less 90 days of any such "flare-ups." The evidence provided by Plaintiff only demonstrates that his condition was "clear" and "mild" throughout the 90-day Elimination Period. HARTLOU 000882-883.

16. Dr. Newman's APS is also a departure from her observations made right after the 90-day Elimination Period in February, March, and April of 2018, in which Dr. Newman failed to note any painful cysts in the groin area. HARTLOU 000741-747.

17. On June 27, 2018, Plaintiff visited Dr. Mannem. This is the first and only record of an office visit with Dr. Mannem provided by Plaintiff, and the visit was apparently for the purpose of completing his disability paperwork rather than receiving care. The visit is also more than five months after the 90-day Elimination Period. HARTLOU 000749-750.

18. Dr. Newman wrote two letters of support for Plaintiff, dated June 29 and July 19, 2018. HARTLOU 000509-511.

19. In those letters, Dr. Newman opined that Plaintiff's HS had "worsened" since he was diagnosed in 2014. Dr. Newman also opined, with no supporting medical records, that starting October 13, 2017 and up to January 11, 2018, Plaintiff was "in a downward spiral with his skin disease with multiple missed days of work, endless visits for painful treatments (and then recovery) and ramping up of medications to (unsuccessfully) control his disease." HARTLOU 000509-511.

20. There is no record that Dr. Newman saw Plaintiff during the 90-day Elimination

Period, and her office notes of visits in February, March, and April 2018 failed to identify any painful cysts in the groin area. HARTLOU 000741-747.

21. In July 2018, Plaintiff provided a letter of support from Dr. Jenkin, which is undated. Dr. Jenkin also failed to provide any medical records or test results in support of her conclusory opinion that Plaintiff's conditions were totally disabling during the 90-day Elimination Period. HARTLOU 000512.

**G.    The Hartford Reviews the Additional Records and Upholds the Denial, First on Additional Review, and Then on Appeal.**

1. The Hartford reviewed the new medical records provided by Plaintiff and determined that, although later flare-ups in Plaintiff's condition may have caused some functional impairment after the 90-day Elimination Period, the records did not support any functional impairment throughout the 90-day Elimination Period. HARTLOU 000027-29.

2. On July 19, 2018, The Hartford upheld its denial on re-review. HARTLOU 000101-103.

3. Plaintiff appealed the denial on July 23, 2018. HARTLOU 000504-506.

4. Although Plaintiff was in constant contact with The Hartford during the appeal process, Plaintiff never provided any additional medical records from the 90-day Elimination Period to support his claim.

5. The Hartford upheld its benefits decision on appeal in a letter dated August 30, 2018. HARTLOU 000096-99.

**CONCLUSIONS OF LAW**

**A.    *De Novo* Review of The Hartford's ERISA Benefits Decision.**

1. The Plan at issue in this matter is governed by the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001, *et seq.* ("ERISA").

2. The parties have stipulated that this matter is governed by the *de novo* standard of review under ERISA. Abatie v. Alta Health & Life Ins. Co._,_ 458 F.3d 955, 963 (9th Cir. 2006).

3. When a court reviews a benefits decision *de novo*, it should still limit its review to only those records before the administrator. Kearney v. Standard Ins. Co., 175 F.3d 1084, 1090 (9th Cir. 1999). Only in those instances where circumstances clearly establish that it is necessary to consider additional evidence for an adequate review will the court consider additional evidence. *Id.* As confirmed in this Court's Order on Motion to Supplement the Administrative Record denying Plaintiff's request to supplement the Administrative Record, this case does not present any such circumstances. Dkt. No. 22.

4. Accordingly, this matter is decided on the Administrative Record, where the Court may evaluate the persuasiveness of conflicting testimony and make findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52. Gallupe v. Sedgwick Claims Management Services, Inc., 358 F. Supp. 3d 1183, 1195 (W.D. Wash. 2019); *accord*, Bunger v. UNUM Life Ins. Co. of Am., 196 F. Supp. 3d 1175, 1177-78 (W.D. Wash. 2016).

5. When a district court reviews an ERISA benefits decision under a *de novo* standard of review, the claimant retains the burden of proving his entitlement to benefits under the Plan. Muniz v. Amec Constr. Mgmt., Inc., 623 F.3d 1290, 1294-95 (9th Cir. 2010); Baxter v. MBA Group Ins. Trust Health and Welfare Plan, 958 F. Supp. 2d 1223, 1227 (W.D. Wash. 2013).

6. Because the burden to prove entitlement to policy benefits rests on the claimant, the court must examine whether the participant has established, by a preponderance of the evidence, that the record supports the conclusion that he is entitled to benefits under the policy. Muniz, 623 F.3d at 1294, 1296.

7. The Plan at issue specifically requires that Plaintiff prove that he was totally disabled on the date of his termination and throughout the 90-day Elimination Period. PLAN 000007-8, 10, 17-18, 25.

8. Thus, Plaintiff must prove, not only that he had a medical diagnosis, but also that his medical conditions made him totally unable to perform his job duties, as defined under the Plan. Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 370 F.3d 869, 880 (9th Cir.

2004), *overruled on other grounds by* <u>Abatie v. Alta Health & Life Ins. Co.</u>, 458 F.3d 955 (9th Cir. 2006).

9. The Plan defines "Total Disability" as occurring when a participant is "unable to perform *with reasonable continuity* the Essential Duties necessary to pursue [his/her] occupation in the usual or customary way" throughout the Elimination Period. AR, PLAN 000025 (emphasis supplied). "Unable to perform with reasonable continuity" does not translate to "continuously and totally unable to perform his job duties."

10. The definitions of "Total Disability" and "Elimination Period" must be read in conjunction with Plan's provision on "Recurrent Disability:" the 90-day Elimination Period will not be "interrupted" as long as the employee does not exceed 30 "return-days" during any Elimination Period calculation. The fact that "Total Disability" is defined by an inability to perform "with reasonable continuity" (as opposed to "a complete and uninterrupted period of non-performance") combined with the fact that a certain number of "return-days" are permitted without triggering a "reset" of the Elimination Period means that Plaintiff is not required to prove that he was "totally unable" to perform his duties for a continuous 90-day period.

11. The application of this interpretation of the Plan is

a. Complicated by the fact that Plaintiff was not employed during the Elimination Period, making any determination of his fitness for work (or the existence of "return-days") more difficult;

b. Ultimately rendered moot by the fact that Plaintiff has failed to submit any medical evidence from the Elimination Period that would support a claim of "Total Disability" during that period.

12. Subjective or conclusory opinions regarding a claimant's work functionality will not suffice to carry Plaintiff's burden of proof. The Ninth Circuit has permitted plan administrators to "seek information on how an impairment actually limited the claimant's functional capacity" through objective evidence. *See* Ross v. Prudential Ins. Co. of Am., 304 Fed. Appx. 502, 503 (9th Cir. 2008); *see also*, Inciong v. Fort Dearborn Life Ins. Co., 570 Fed. Appx. 724, 725 (9th Cir. 2014) (affirming denial of benefits because the plaintiff "had failed to provide sufficient objective and quantifiable evidence to support his claim of total disability").

13. The claimant's "subjective evidence is persuasive only to the extent it is corroborated by other evidence of medically documented impairments showing that she has functional limitations or restrictions that render her disabled from working." Perryman v. Provident Life and Accident Ins. Co., 690 F. Supp. 2d 917, 943 (D. Ariz. 2010).

14. In assessing any proffered subjective evidence, courts should give little weight to after-the-fact conclusory opinions that are contrary to the objective medical evidence in the record. Jordan, 370 F.3d at 880; *accord* Page v. Life Ins. Co. of N. Am., 305 Fed. Appx. 318, 319 (9th Cir. 2008).

15. Whether or not a claimant may have become disabled *after* the 90-day Elimination Period is irrelevant. Wakkinen v. UNUM Life Ins. Co. of Am., 531 F.3d 575, 584 (8th Cir. 2008) (affirming judgment for the plan where the plaintiff failed to prove that he was continuously disabled through the 180 days of his elimination period, even though one or more of his conditions "may well have rendered him disabled after the elimination period ended"); Butts v. Continental Casualty Co., 357 F.3d 835, 839 (8th Cir. 2004) (affirming judgment for the plan where the plaintiff was not disabled until her "condition took a turn for the worse shortly after the elimination period ended").

**B.   Plaintiff Has Not Met His Burden of Proving Total Disability Throughout the 90-Day Elimination Period.**

1. Plaintiff's infrequent and intermittent leaves leading up to his termination do not

meet his burden of proving that he was unable to perform his own occupation with "reasonable continuity" on the date of his termination on October 13, 2017, or throughout the 90-day Elimination Period. In particular, the records affirmatively show that Plaintiff's GI issues had resolved by September 14, 2017 (prior to the start of the Elimination Period) to the point where Plaintiff's treating gastroenterologist, Dr. Carlson, admitted the condition no longer warranted any leave from work. Additionally, Plaintiff's counsel stipulated in open court that his dermatological condition did form the basis of Plaintiff's assertion of a right to LTD benefits.

2. The sparse medical records during the 90-day Elimination Period likewise fail to support his claim that he was Totally Disabled throughout that time. If anything, the December 7, 2017 visit with Dr. Jenkin is affirmative evidence that Plaintiff's dermatological issues were not disabling at that point in the Elimination Period.

3. The dermatological medical records after the 90-day Elimination Period do not persuasively relate back to the 90-day Elimination Period. There is no evidence of any potentially disabling dermatological conditions, such as painful lesions in the groin area, until April 9, 2018, more than three months after the end of the Elimination Period.

4. While Plaintiff and his treating physicians contend that Plaintiff needed medical treatment for painful cysts and lesions, such as surgical intervention and injections, it is significant that there are no visits with treating physicians for any such painful cysts or lesions within the eleven-month period before, during, and immediately after the Elimination Period; further evidence that Plaintiff's dermatological conditions were not disabling throughout the Elimination Period.

5. The after-the-fact, conclusory opinions regarding Plaintiff's work functionality during the 90-day Elimination Period are uncorroborated by any objective evidence of disabling conditions throughout the 90-day Elimination Period and are, therefore, unpersuasive.

6. Dr. Mannem's two APS reports, both completed after the 90-day Elimination Period, contradict one another – first citing GI issues as the primary concern, with an expected return to work a few weeks later, and later citing dermatological issues as the primary concern,

with an unknown return to work date. Dr. Mannem's conclusory opinions in each that Plaintiff is unable to work are unsupported by any medical records or testing. Dr. Mannem's APS reports are inconsistent and unpersuasive.

7. Dr. Jenkin's APS, completed over four months after the 90-day Elimination Period ended, appears to be based on Plaintiff's then-current symptoms and not the symptoms noted in Dr. Jenkin's own contemporaneous medical records during the 90-day Elimination Period. Dr. Jenkin's follow-up letter of support, provided during the appeal, fails to provide any medical records or test results to support her conclusory opinion of Plaintiff's work functionality during the 90-day Elimination Period. Further, Dr. Jenkin's conclusory opinions are contradicted by her one and only office visit note during the 90-day Elimination Period, in which she described Plaintiff's dermatological conditions as "clear" and "mild." Dr. Jenkin's APS and letter are therefore unsupported, contrary to her own contemporaneous medical record, and unpersuasive.

8. Dr. Newman's APS, completed over five months after the 90-day Elimination Period ended, only supports disability during "flare-ups," and there is no medical evidence of any such "flare-ups" during the 90-day Elimination Period. Dr. Newman's following two letters of support, provide nothing more than conclusory opinions about Plaintiff's alleged medical conditions and work functionality during the 90-day Elimination Period even though there is no record of Dr. Newman visiting with Plaintiff during the 90-day Elimination Period. Dr. Newman misrepresents the facts of that time period, incorrectly stating that Plaintiff "missed days of work" when Plaintiff had already been terminated from Oracle and was not working at the time. Dr. Newman's APS and conclusory letters of support are also contrary to her own office visits in February, March, and April of 2018, just after the 90-day Elimination Period, in which Dr. Newman failed to note any painful cysts in the groin area. Dr. Newman's conclusory opinions are therefore inconsistent, unsupported, contrary to her own medical records in the three months following the 90-day Elimination Period, and unpersuasive.

9. Finally, evidence of Plaintiff's disability after the 90-day Elimination Period is unavailing. The APS reports and supporting letters from Plaintiff's treating physicians (Dr. Mannem, Dr. Jenkin, and Dr. Newman) were all created well after the Elimination Period and fail to provide or refer to any objective evidence of disabling conditions throughout the Elimination Period (which would be expected given the objective nature of his conditions). The APS reports and supporting letters are, therefore, unpersuasive. In particular, Dr. Newman's July 19, 2018 letter incorrectly argues that Plaintiff was "in a downward spiral with his skin disease and with multiple missed days of work, endless visits for painful treatments (and then recovery) and ramping up of medications to (unsuccessfully) control his disease." In fact, Plaintiff had already stopped working, and there are no records of any such visits or ramping up of medications during this time frame. The only dermatological visit during this period indicated Plaintiff's condition was clear and mild. To the extent the medical records after January 10, 2018 support some work restrictions or limitations, they do not reach back to support any work restrictions or limitations prior to that date.

10. Accordingly, The Hartford's decision to deny LTD benefits to Plaintiff is upheld as a matter of law because Plaintiff has failed to meet his burden of proving that he was Totally Disabled under the terms of the Plan on October 13, 2017, and throughout the subsequent 90-day Elimination Period.

11. The Court finds for the Defendant; judgment will be entered in Defendant's favor forthwith.

The clerk is ordered to provide copies of this order to all counsel.

Dated January 3, 2020.

Marsha J. Pechman
United States Senior District Judge

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 17